J-A18019-19

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| IN RE: S.M., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: C.M. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 74 WDA 2019 |

Appeal from the Order Entered December 19, 2018
In the Court of Common Pleas of Bedford County Orphans' Court at
No(s):  No. 5 AD for the year 2016

BEFORE:  BOWES, J., NICHOLS, J., and MUSMANNO, J.

MEMORANDUM BY NICHOLS, J.:                    FILED JANUARY 7, 2020

C.M. (Father)[1] appeals from the order granting the petition filed by L.C.

(Maternal Aunt) to involuntarily terminate his parental rights to his minor

_____

[1] As discussed below, the trial court also terminated the parental rights of Child's mother, C.C., (Mother), and entered orders in related custody matters at No. 376 for the year 2015 (376 of 2015) and No. 1356 for the year 2015 (1356 of 2015).  Mother appealed the order terminating her parental rights, as well as the custody orders.  Mother discontinued one of her three appeals. Subsequently, Mother passed away while her remaining two appeals were pending.  On July 24, 2019, this Court granted the motion filed by Mother's counsel seeking permission to withdraw Mother's remaining two appeals.  On July 29, 2019, Mother's counsel filed a motion to reinstate the two withdrawn appeals.  This Court denied the motion on August 9, 2019. Father did not separately appeal the custody orders or challenge the custody orders in this appeal.

child, S.M. (Child), born in September 2012, pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(1) and (b). We affirm.

The trial court set forth the relevant factual background and procedural history of this appeal as follows:[2]

> [Child] was born prematurely . . . in [Anne] Arundel County, Maryland. [Child] remained in the hospital [for more than three weeks] because she had difficulty feeding and had been placed on a feeding tube and a cardiac respiratory monitor. Hospital staff contacted [Anne] Arundel County Department of Social Services when [Father and Mother] visited [Child] at the hospital and both parents appeared to be intoxicated.
>
> Subsequently on September 24, 2012, at a Team Decision meeting held by [Anne] Arundel County Social Services, it was believed [Father] was again under the influence of alcohol and a toxicology performed on [Father] tested positive for alcohol. [Father] denied the use of alcohol. [Father] left the meeting and later that day attempted to remove the child from the hospital, and had to be stopped by security. [Anne] Arundel County placed [Child] in foster care on September 25, 2012, and on February 6, 2013, [Child] was placed with [Maternal Aunt]. In November of 2013, [Maternal Aunt]'s residence in Harrisburg, Pennsylvania was approved as a foster home by Dauphin County Children and Youth Services. Approved status was originally granted in January of 2013. [Father] had been arrested for driving while under the influence in Maryland in May of 2011. On May 20, 2013, [Father] plead[ed] guilty to second degree assault in Anne Arundel County, Maryland, and had already served 177 days on the charge. In October [of] 2013, Bedford County Children and Youth Services did a home study on [Mother]'s residence in Bedford County[, Pennsylvania] with [Maternal Grandmother and her Maternal Grandfather, (collectively Maternal Grandparents)]. [Mother]'s other residence was in Maryland.

_____

[2] We include the discussion set forth in the trial court opinion concerning Mother and the custody matters involving Child as is necessary for background to Father's appeal from the termination of his parental rights.

- 2 -

In October of 2012, [Mother] had her supervised visits suspended for alcohol use. [Father]'s visits continued and [Mother] was referred for a substance abuse assessment. The [Anne] Arundel County services also contact[ed] various family members about becoming a placement resource. [Maternal Grandmother] replied she could not be a placement service but would like to be a visiting source. Subsequently[, Mother] attended Alcoholic Anonymous meetings and in October of 2013 was admitted to an impatient facility. However, on November 6, 2013, she was unsuccessfully discharged after she failed an intoxilyzer test with a reading of .262. [Father] was also admitted to the same inpatient facility and also tested positive for alcohol. [Father] was able to have a visit with [Child]. In December of 2014, [Father] was again incarcerated. By that time [Mother] had unsupervised visits with [Child], although [Child] was still primarily in the care of [Maternal Aunt]. In April of 2014, [Father] was released from incarceration but did not have stable housing. In January of 2014, [Child] was placed with [Mother] for a trial home visit here in Bedford County where she would reside with [Maternal Grandparents]. In May of 2014[, Father] requested a visit with [Child] which was arranged for May 14, 2014. [Father] did not appear. In April of 2014, [Mother] was arrested in Florida for driving under the influence during a visit with her family and was sentenced to 23 days of jail. In July of 2014, [Father] tested positive for the use of alcohol. [Father] was also incarcerated for theft. Commencing with the return of custody to [Mother] in January of 2014, Bedford County Children and Youth Services conducted monthly visits at [Mother]'s residence in Bedford, no safety issues were noticed.

. . . In September [of] 2014, [Father] tested positive for alcohol by mouth swab. The Department arranged for a lab test; [Father] did not appear. In December, 2014, the Anne Arundel County Department of Social Services recommended that [a c]ourt grant custody to [Mother].

. . . [O]n September 3, 2015, [Maternal Grandmother] filed a petition for emergency relief. This petition, prepared by counsel and verified by [Mother[3]], alleged [Father] was in the Bedford County Jail[, and Mother was intoxicated and admitted for treatment at a hospital. Mother maintained custody contingent upon an agreement signed by Grandmother and Mother that

_____

[3] A copy of Maternal Grandmother's petition was not included in the certified record transmitted to this Court on appeal.

- 3 -

Mother not consume alcohol while she had custody of Child. Although a copy of the agreement was sent to Father at Bedford County Jail, he did not sign the agreement.]

. . . On December 15, 2015, [Maternal Grandparents] went to Florida and left [Child] in the sole care of [Mother]. On December 16, 2015, at 4:26 p.m. Trooper Joseph Watkins was dispatched to the [Maternal Grandparents'] residence to do a wellness check. When the Officer arrived he [found Mother in an intoxicated state with Child, who was approximately three years of age at the time]. The Officer summoned County Children and Youth Services who took custody of [Child]. [Mother] was charged with child endangerment, and resisting arrest. On March 1, 2016, she pled guilty to those offenses and on that same date was sentenced . . . .

On December 17, 2015, [Maternal Aunt] filed her petition for custody [at 1356 of 2015]. . . .

\* \* \*

[Father was] 31 years of age, having been born [in 1986]. . . . [W]hen [Maternal Grandmother] was exercising custody in 2014 and 2015[,] he would go to the house and acted as a care provider for a "night or two". . . . Further, [Father] admits he refused to go to the classes [Anne] Arundel County[, Maryland,] recommended because he did not believe he had an alcohol problem[,] and [he] couldn't go to "groups" because of his work. [Father] advised he would be incarcerated in Bedford County "a couple of months at a time" because he would not report to probation because he had work. It appears his most recent [Pennsylvania] state incarceration[, which commenced in August of 2015, when Child was two and a half to three years old,] was related to theft of a firearm.

Trial Ct. Op., 12/19/18, at 1-7, 10-12, 15, 18 (some formatting altered).

On June 3, 2016, Maternal Aunt filed a petition to involuntarily terminate Mother and Father's parental rights to Child.[4]  With respect to Father, Maternal Aunt proceeded under Section 2511(a)(1) and (b) of the Adoption Act.

The trial court conducted hearings on the petitions for custody and the termination of parental rights on June 17, 2016, August 2, 2016, November 2, 2016, March 1, 2017, April 12, 2017, September 14, 2017, February 7, 2018, and October 3, 2018.  Father was incarcerated during the first five hearings[5] and testified at the April 12, 2017 by video.  Father was paroled in

_____

[4] The trial court concluded that Maternal Aunt had standing to seek termination of Father's parental rights.  Father did not object to Maternal Aunt's standing in the trial court, and as the trial court noted, a court may not raise the issue of standing sua sponte.  Trial Ct. Op., 12/19/18, at 15 (citing In re Nomination Petition of deYoung, 903 A.2d 1164, 1168 (Pa. 2006); Weber v. Weber, 168 A.3d 266 (Pa. Super. 2017)).  Moreover, Father has not challenged Maternal Aunt's standing in this appeal.  See Krebs v. United Refining Co., 893 A.2d 776, 797 (Pa. Super. 2006) (stating that a failure to preserve issues by raising them both in the concise statement of errors complained of on appeal and statement of questions involved portion of the brief on appeal results in a waiver of those issues).  Therefore, we will not consider whether Maternal Aunt has standing.

[5] The first three hearings on June 17, 2016, August 2, 2016, and November 2, 2016, principally addressed the custody matters.  Father participated pro se by telephone at those hearings.  Father was represented by counsel for the remaining hearings on March 1, 2017, April 12, 2017, September 14, 2017, February 7, 2018, and October 3, 2018, which addressed the petition to terminate his parental rights.

The trial court, in an amended rule to show cause dated June 7, 2016, appointed Attorney Carol Rose to serve as the guardian ad litem ("GAL") for Child.  In an order dated June 19, 2017, and entered on June 28, 2017, the trial court appointed Attorney Rose to serve as the legal counsel for Child, finding that there was no conflict in Child's best interests and her preferred

July of 2017, but absconded from a halfway house in August of 2017. Father did not appear or participate in the September 14, 2017 hearing. The trial court permitted Father to testify by telephone at the February 7, 2018 hearing, and Father explained his decision to leave the halfway house and not to return to the custody of Pennsylvania authorities. Father did not participate in a court-ordered bonding assessment.[6]

_____

outcome. See N.T., 10/3/18, at 26-35. Therefore, Child's right to counsel under 23 Pa.C.S. § 2313(a) was satisfied. See In re Adoption of K.M.G., ___ A.3d ___, 2019 PA Super 281, 2019 WL 4392506 (Sept. 13, 2019) (en banc) (holding that (1) "this Court's authority is limited to raising sua sponte the issue of whether the orphan's court violated Section 2313(a) by failing to appoint any counsel for the Child in a termination hearing," and (2) we may not "review sua sponte whether a conflict existed between counsel's representation and the child's stated preference in an involuntary termination of parental rights proceeding" (citations omitted) (emphasis in original)), appeal granted, 362 WAL 2019 (Pa. filed Dec. 9, 2019); see also In re T.S., 192 A.3d 1080, 1089-90, 1092-93 (Pa. 2018) (reaffirming the ability of an attorney-guardian ad litem to serve a dual role and represent a child's non-conflicting best interests and legal interests); In re Adoption of L.B.M., 161 A.3d 172, 174-75, 180 (Pa. 2017) (plurality) (stating that, pursuant to 23 Pa.C.S. § 2313(a), a child who is the subject of a contested involuntary termination proceeding has a statutory right to counsel who discerns and advocates for the child's legal interests, defined as a child's preferred outcome).

[6] Following the March 1, 2017 hearing, the trial court entered an order for Father to participate in a bonding assessment conducted by Terry O'Hara, Ph.D. On March 29, 2017, Father filed a motion to delay the bonding assessment until he was paroled from a Pennsylvania State Prison. As noted above, Father left his halfway house following his parole, and he did not participate in a bonding assessment.

On December 19, 2018, the trial court entered the order terminating Father's parental rights.[7]  Father timely filed a notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Father raises the following issue:

[Whether t]he trial court committed an error of law and/or an abuse of discretion in terminating [Father's] parental rights to [Child], when it relied substantially upon [Father's] incarceration as a basis upon which to terminate parental rights pursuant to [23 Pa.C.S. § 2511(a)(1)].

Father's Brief at 6.

Father argues that the trial court decided to terminate his parental rights because he has been incarcerated for most of Child's lifetime.  Id. at 7.  Father notes the trial court found that his incarceration caused his failure to fulfill his parental responsibilities and develop any substantial relationship with Child.  Id.  While Father acknowledges that the trial court terminated his parental rights under Section 2511(a)(1), he cites Section 2511(a)(2), to assert that his incarceration will be remedied within a reasonable period of time  See id. at 8-12.  In sum, Father contends that after he is released from his incarceration, he will seek custody of Child and remedy his parental incapacity caused by his incarceration.

_____

[7] The trial court also awarded legal custody and primary physical custody of Child to Maternal Aunt and partial physical custody to Maternal Grandmother.

In reviewing an appeal from an order terminating parental rights, we apply the following standard of review:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. [In re R.J.T., 9 A.3d 1179, 1190 (Pa. 2010)]. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.
>
> As we discussed in R.J.T., there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

In re Adoption of S.P., 47 A.3d 817, 826-27 (Pa. 2012) (some citations omitted).

The burden is on the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. In re R.N.J., 985 A.2d 273, 276 (Pa. Super. 2009). We

have explained that "[t]he standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" Id. (citation omitted).

Section 2511(a)(1) provides, in relevant part, as follows:

(a) General rule.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S. § 2511(a)(1).

"A court may terminate parental rights under Section 2511(a)(1) where the parent demonstrates a settled purpose to relinquish parental claim to a child or fails to perform parental duties for at least the six months prior to the filing of the termination petition." In re Z.P., 994 A.2d 1108, 1117 (Pa. Super. 2010) (emphasis in original). "Although it is the six months immediately preceding the filing of the petition that is most critical in the analysis, the trial court must consider the whole history of given case and not mechanically apply the six-month statutory provision." In re B., N.M., 856 A.2d 847, 855 (Pa. Super. 2004) (citation omitted).

Our Supreme Court has held,

[o]nce the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must

- 9 -

engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

Matter of Adoption of Charles E.D.M., II, 708 A.2d 88, 91 (Pa. 1998) (citation omitted); accord In re J.T.M., 193 A.3d 403, 409 (Pa. Super. 2018).

It is well settled that:

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

In re B., N.M., 856 A.2d at 855 (citations and internal quotation marks omitted).

With regard to a parent's incarceration, our Supreme Court has stated

> [A] parent's absence and/or failure to support due to incarceration is not conclusive on the issue of abandonment. Nevertheless, we are not willing to completely toll a parent's responsibilities during his or her incarceration. Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison in continuing a close relationship with the child. Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited.

S.P., 47 A.3d at 828.

Instantly, the trial court explained its decision to terminate Father's parental rights as follows:

> Turning to termination of [Father]'s rights, pursuant to 2511(a)(1)[, t]he record supports he has not performed parental duties and . . . by his actions[,] has evidenced a settled purpose of relinquishing his parental claims to [Child]. [Father] has never had custody of [Child]. Since [Child]'s birth, he has been in and out of jail. When [Anne] Arundel County asked him to participate in alcohol counseling, he did not because he did not believe he had an alcohol problem, despite being intoxicated when he was visiting [Child] at the hospital after her premature birth, and again being intoxicated at a team decision meeting. . . . Father [ ] also declined to attend group counseling because of his work. . . . [Father] would be incarcerated in the Bedford County Jail for months at a time due to his unwillingness to comply with the terms of his parole conditions. Finally, as noted, he [most recently] received a state sentence related to theft of a firearm[,] and he was released in 2017. While [Father] was in the County Jail[ presumably awaiting disposition of his most recent charges,] Mother . . . would have [Child] speak to him on the phone four or five times and [before, his incarceration, Maternal Grandmother] would allow him to visit [Child] in her home[,] and he acted as a care provider on one or two occasions.
>
> [Father's] very limited contact with [Child], most of which was caused by his repeated failure to obey the law or the terms of supervision, ha[s] prevented him acting as a parent to [Child]. . . . There is no evidence [that Father] ever attempted to establish a parental relationship with [Child].

Trial Ct. Op., 12/19/18, at 20-21.

Moreover, the trial court noted the following as to Father's conduct after the petition to terminate his parental rights was filed:

In his testimony on March 1[], 2017, [Father] said he was ready to be a father and that eventually he could take sole custody of [Child]. [Father] was released from prison on July 28, 2017. [Father] also testified on February 7, 2018. At that time, he stated he had left the halfway house where he was paroled to. [Father] conceded there was an active warrant for his arrest as a result of "walking away" from the half-way house. . . .

\* \* \*

Significantly, when given an opportunity to undergo a bonding assessment with [Child], he declined until he was at a half-way house. Once placed at the facility, he absconded. In his phone testimony on February 7, 2018, [Father] stated he had profitable employment earning $36.00 an hour, or approximately $1,200.00 to $1,500.00 [a week;] however, he adamantly refused to concern himself paying any support for [Child] while she was with [Maternal Aunt], stating that he, "will not have anything to do with [Maternal Aunt]." [Father] also admitted [that,] for [Child]'s entire life[,] he was either in jail or dealing with criminal issues. Because of his fugitive status, he was not in a position to have contact with [Child].

. . . Further, when possessed of a job that enabled him to help to care for [Child], he refused to do so because of his dislike of the [Maternal Aunt]. Of course, it is true that this dislike is mutual[;] however, it seems [Father] has lost sight of the fact that it was [Maternal Aunt]'s willingness to take [Child] back in 2013 that kept [Child] out of the foster care system, and with family. . . . The [trial court] recognizes that incarceration alone is not determinative of parental capacity. However, [Father's] repeated refusal to comply with parole rules and conditions do evidence a settled purpose of relinquishing parental claims, since he puts his unwillingness to follow societal rules before the interests of his daughter.

Id. at 10, 21-22.

Following our review, this Court finds competent, clear, and convincing evidence supporting the trial court's decision. See S.P., 47 A.3d at 826-27.

The record shows that while Father made some attempts to remain in Child's life, he has failed to remain in a position to fulfill his parental duties to Child. Before the filing of the instant petition, he did not seek or exercise primary custody of Child. Father only acted as Child's caretaker on one or two occasions on weekends. Moreover, we acknowledge Father's argument that his most recent sentence could expire within a year or two. However, we agree with the trial court that Father's conduct before and after the filing of the instant petition belied his stated intent to maintain a stable parent-child relationship with Child even if he satisfied his current sentence. Therefore, Father's argument merits no relief.

Next, we note that Father has not challenged the trial court's determination that termination of his parental rights was proper under Section 2511(b) in either his concise statement of errors complained of on appeal or his appellate brief. While we could find such an issue waived for failure to present an argument or cite legal authority, we will address the issue. See In re C.L.G., 956 A.2d 999, 1009 (Pa. Super. 2008) (en banc) (addressing the best interests of the child under Section 2511(b) sua sponte). But see M.Z.T.M.W., 163 A.3d 462, 466 & n.3 (Pa. Super. 2017).

Section 2511(b) states:

> (b) Other considerations.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings,

> income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S. § 2511(b).

This Court has stated that the focus in terminating parental rights under Section 2511(a) is on the parent, but the focus of Section 2511(b) is on the child. See C.L.G., 956 A.2d at 1008. In reviewing the evidence in support of termination under Section 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." In In re E.M., 620 A.2d [481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond.

In re T.S.M., 71 A.3d 251, 267 (Pa. 2013) (some citations omitted).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." In re Z.P., 994 A.2d 1108, 1121 (Pa. Super. 2010) (citations omitted). Further, "in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists." In re Adoption of J.M., 991 A.2d 321, 324 (Pa. Super. 2010) (citation omitted).

A parent's neglect is relevant:

concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a de facto beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

In re K.K.R.-S., 958 A.2d 529, 535 (Pa. Super. 2008) (citations and quotation marks omitted). Thus, the court may emphasize the safety needs of the child. See In re K.Z.S., 946 A.2d 753, 763 (Pa. Super. 2008) (affirming involuntary termination of parental rights, despite existence of some bond, where placement with mother would be contrary to child's best interests).

Regarding Section 2511(b), the trial court stated:

As to the analysis under [Section] 2511(b), there appears to be no bond between [Child] and her father, as he has never spent any significant time with her[,] and has had only very limited contact since her birth. It is difficult to see what benefit [Child] would gain from increased contact with [Father]. . . .

Based on the record, the [trial court] will terminate the parental rights of [Father]. The Guardian ad Litem, [sic] supported termination of the [Father's] parental rights. It should be noted that [Maternal Aunt] has expressed a willingness to adopt [Child].

Trial Ct. Op., 12/19/18, at 22.

This Court finds the trial court's termination of Father's parental rights under Section 2511(b) is supported by competent, clear and convincing

evidence in the record. See S.P., 47 A.3d at 826-27. The trial court appropriately weighed Child's permanence and safety against any affection Child might feel for Father. See T.S.M., 71 A.3d at 267. Further, this Court has held that a parent's love of his child, alone, does not preclude a termination. See In re L.M., 923 A.2d 505, 512 (Pa. Super. 2007) (stating that a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights). It is well-settled that "we will not toll the well-being and permanency of [a child] indefinitely." C.L.G., 956 A.2d at 1007 (citing In re Z.S.W., 946 A.2d 726, 732 (Pa. Super. 2008) (noting that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting.")).

Accordingly, we affirm the order of the trial court terminating Father's parental rights under Section 2511(a)(1) and (b).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/7/2020

- 16 -